# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF ILLINOIS, *ex rel.* ANTHONY J. DUSTMAN, | ) ) ) ) | |
| Plaintiffs and Relator, | ) ) | Case No.  1:20-cv-01243 |
| v. | ) ) ) | |
| ADVOCATE HEALTH AND HOSPITALS CORPORATION d/b/a ADVOCATE BROMENN MEDICAL CENTER, THE CARLE FOUNDATION, BROMENN PHYSICIAN MANAGEMENT CORPORATION, THE CENTER FOR ORTHOPEDIC MEDICINE, LLC, MCDERMOTT WILL & EMERY, and ATTORNEY JOHN AND JANE DOE, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER & OPINION

This matter is before the Court on Defendants' joint Motion to Dismiss (doc. 32) Relator Anthony J. Dustman's *qui tam* action. Plaintiffs (the United States and the State of Illinois) have given notice that they decline to intervene at this time. (Doc. 8). The Complaint (doc. 1) has been unsealed, all Defendants have moved to dismiss, and that Motion has been fully briefed. For the following reasons, Defendants' Motion is granted, and Relator is given leave to file an amended complaint only with respect to his claims against The Center for Orthopedic Medicine under the False Claims Act and Illinois False Claims Act and on theories of unjust enrichment and payment by mistake.

## BACKGROUND

Relator, Dr. Anthony J. Dustman, is a founding member of The Center for Orthopedic Medicine, LLC, a limited liability company operating an ambulatory surgical center located in Bloomington, Illinois. (Doc. 1 at 2–3). Acting *qui tam* on behalf of the state and federal governments, he filed suit against The Center for Orthopedic Medicine (TCOM), several other owner-members of TCOM, and the law firm that prepared TCOM's operating agreement and other pertinent legal documents.

Relator's allegations, which the Court accepts as factually true at this stage, are derived "from his direct knowledge of Defendants' fraud and improper conduct, as a member in the Defendant company, [TCOM], recently learning Defendants had previously devised a scheme to hide the true identity of those entities holding ownership/membership interests in the company." (Doc. 1 at 4). He describes the ownership and operational structure of TCOM as follows: TCOM is an LLC operating in conjunction with BroMenn Comfort Care & Suites, a recovery care center (RCC) where patients in need of overnight care following surgery can stay for observation. (Doc. 1 at 28–30).

TCOM has both institutional and individual members. (Doc. 1 at 23). A number of individual surgeons are named in the operating agreement as "physician class members." (Doc. 1 at 23). The institutional members are McLean County Surgicenter Ltd. (a professional corporation of which Relator is the sole shareholder) and a list of "institutional class members": Carle Clinic Association (CCA), The Carle Foundation

(Carle), BroMenn-Advocate Healthcare Hospitals (Advocate),[1] and BroMenn Physician Management Corporation (BPMC).[2] (Doc. 1 at 23). By the terms of the operating agreement, when a physician class member or a physician affiliated with McLean County Surgicenter refers a patient to TCOM, he or she must personally provide the medical services for which the patient was referred. (Doc. 1 at 24).

Initially, Relator assumed BPMC and CCA were both subsidiaries of hospitals; however, he later found out that they are instead group medical practices comprised of primary care and specialty physicians who are not surgeons. (Doc. 1 at 23). BPMC and CCA physicians referred patients to TCOM, yet they themselves did not perform surgery or oversee care provided at TCOM. (Doc. 1 at 22, 31).

Relator claims that unidentified physicians in the two group practices were referring patients to TCOM and then sharing in TCOM's revenues in ways that did not fit into any "safe harbor" defined in regulatory guidance and thus violated federal and state laws that prohibit self-dealing in health care. (Doc. 1 at 11). Under the Stark Law, a federal statute also known as the Ethics in Patient Referrals Act, physicians may not refer patients to other providers with which they have an impermissible financial relationship (as defined in the statute). 42 U.S.C. § 1395nn(a)(1). And under the Illinois Health Care Worker Self-Referral Act, a health

---

[1] While Relator calls this entity "BroMenn-Advocate Healthcare Hospitals" and later "BroMenn" in the context of discussing the TCOM operating agreement, it appears to the Court that he is referring to the same entity sued as "Advocate Health and Hospitals Corporation" doing business as "Advocate BroMenn Medical Center" and elsewhere referred to simply as "Advocate." The Court will use "Advocate" to denote the health system with these various names.
[2] Relator states on information and belief that BPMC is doing business under the name Advocate BroMenn Medical Group. (Doc. 1 at 25).

care practitioner may not refer patients to another provider or entity in which he or she holds an ownership interest, unless the referring provider will personally treat the referred patient (or some other exception applies). 225 ILCS 47. Relator alleges the above-described arrangement runs afoul of both. He also links TCOM's ownership structure to violations of the Anti-Kickback Statute, a federal law prohibiting certain types of payments, gifts, and reimbursements in exchange for healthcare referrals. 42 U.S.C. § 1320a-7b(b).

Relator further alleges an unlawful relationship between TCOM and BroMenn Comfort Care & Suites. TCOM and the RCC share space and equipment and are operated as essentially one entity. (Doc. 1 at 28). Patients are more or less automatically transferred to the RCC if they need to stay overnight following surgery at TCOM. (Doc. 1 at 29–30). There is significant overlap between the members of TCOM and the owners of BroMenn Comfort Care, and Advocate owns an 83.5 percent interest in the RCC. (Doc. 1 at 28). The RCC pays TCOM for each referred patient, and TCOM's member-investors benefit financially. (Doc. 1 at 29–31).

Defendants violated the False Claims Act (FCA) and Illinois False Claims Act (IFCA), Relator says, by submitting false claims to Medicare and Medicaid (medical assistance programs operated and overseen by the federal and state governments respectively). (Doc. 1 at 2). He attests the bills are false and fraudulent because they were for services provided to patients referred to TCOM in violation of healthcare laws and regulations, and to patients with respect to whom kickbacks were paid to TCOM by the RCC. (Doc. 1 at 3). Furthermore, Relator alleges, Defendants

4

deliberately structured TCOM on paper (with the help of Defendant MWE and its attorneys) in such a manner as to conceal from regulatory oversight bodies the fact that it was operating unlawfully as previously described. (Doc. 1 at 2).

Relator brings four claims against the five defendants (TCOM, Advocate, BPMC, Carle, and MWE). CCA is no longer a member of TCOM, as it was purchased by The Carle Foundation, and only The Carle Foundation, not CCA, is named as a Defendant in this action. (Doc. 1 at 6). Relator has not sued any individual physicians—either physician class members of TCOM or any physicians maintaining practices under the auspices of BPMC or CCA.

Count 1 states Defendants are liable under the False Claims Act for unlawful conduct in that they knowingly submitted false or fraudulent claims for payment, knowingly making false statements to the government to induce payment, knowingly received improper payments to which they were not entitled, and falsely certified compliance with the law. (Doc. 1 at 34). Count 2 claims Defendants violated the AKS by knowingly and willfully paying kickbacks to induce or reward healthcare referrals for services reimbursed by Medicare and Medicaid. (Doc. 1 at 34–35). Count 3 alleges Defendants violated the IFCA in the same manner as the FCA. (Doc. 1 at 35). Count 4 alleges Defendants violated the Illinois Health Care Worker Self-Referral Act by referring patients to outside entities in which the Defendants were investors and did not provide direct patient care. (Doc. 35–36). Relator asks for civil penalties plus treble damages for each false or fraudulent claim, as § 3730 of the FCA allows, with

30 percent of the total recovery going to him and the rest to the government Plaintiffs. (Doc. 1 at 36).

**LEGAL STANDARD**

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the complaint must contain "a short and plain statement" of the plaintiff's claim sufficient to plausibly demonstrate entitlement to relief. Fed. R. Civ. P. 8(a); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. at 556).

At this stage, the Court construes the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true and drawing "all reasonable inferences from those facts in favor of the plaintiff." *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). However, those statements which are legal conclusions rather than factual allegations are not taken as true. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012).

Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The False Claims Act is an anti-fraud statute; claims made pursuant to it are subject to the Rule 9(b) standard. *See, e.g., United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 778 (7th Cir. 2016). To meet the requirements of Rule 9(b), "[t]he plaintiff must describe the 'who, what, when, where, and how' of the fraud—'the first

paragraph of any newspaper story.' " *Berkowitz*¸ 896 F.3d at 839 (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*¸ 570 F.3d 849, 853 (7th Cir. 2009)). The Seventh Circuit has cautioned that courts should not "take an overly rigid view" of this shorthand, and that the precise details "may vary on the facts of a given case." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d at 776 (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) ("Pirelli")). "Nevertheless, plaintiffs must use some means of injecting precision and some measure of substantiation into their allegations of fraud." *Berkowitz*, 869 F.3d at 840 (citations, internal quotation marks, and alterations omitted).

## DISCUSSION

### I.  Jurisdiction

As a preliminary matter, the Court must assure itself that it has jurisdiction over the present action. Relator brings suit under the False Claims Act, a federal statute that explicitly creates a right of action for *qui tam* parties, 31 U.S.C. § 1320a-7b(b); this Court possesses federal-question jurisdiction over that claim. 28 U.S.C. § 1331.

He also asserts claims under two Illinois state statutes, the Illinois False Claims Act, 740 ILCS 175, and the Illinois Health Care Worker Self-Referral Act, 225 ILCS 47. This raises the question of whether this Court may exercise jurisdiction over those pendant state claims. In civil actions where the court has original jurisdiction over at least one claim under the federal questions doctrine, "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in

the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Here, Relator's state-law claims arise from the same alleged scheme and are brought against the same defendants. The state statutes in question also closely mirror their counterparts in federal law, such that Relator's state-law claims are largely parasitic upon findings of law and fact pertaining to his federal claims, particularly with respect to the False Claims Act. Thus, this case does not invoke any of the applicable special circumstances that allow a district court to decline to exercise supplemental jurisdiction under § 1367(c)—novel questions of state law, state claims that "substantially predominate" over the federal claims, or other "compelling reasons." *Id.*

A second jurisdictional question is whether the Court may dismiss this action without first obtaining consent of Plaintiffs, the United States and the State of Illinois. In their Notice of Election to Decline Intervention (doc. 8), both government parties refer the Court to 31 U.S.C. § 3730(b)(1) and the state statutory provision that mirrors it, 740 ILCS 175/4(b)(1): The "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." They interpret this language to support their "request that, should either the Relator or the Defendants propose that this action be dismissed, settled, or otherwise discontinued, this Court solicit the written consent of the United States and the State of Illinois before ruling or granting its approval." (Doc. 8 at 2).

Inasmuch as Plaintiffs include involuntary as well as voluntary dismissals within the scope of their reading of the statutes, they are incorrect. It is well

8

established in the circuits that have examined this question, including the Seventh Circuit, that the government's consent is only required for voluntary dismissals, when the relator voluntarily withdraws his or her suit or settles the matter with the defendant, not rulings in which a court grants a defendant's motion to dismiss over the relator's opposition. *Salmeron v. Enterprise Recovery Sys.*, 579 F.3d 787, n. 5 (7th Cir. 2009); *see also United States ex rel. Shaver v. Lucas W. Corp.*, 237 F.3d 932, 934 (8th Cir. 2001); *Minotti v. Lensink*, 895 F.2d 100, 103 (2nd Cir. 1990); *Searcy v. Philips Elecs. N. Am. Corp.*, 117 F.3d 154, 158 (5th Cir. 1997) (recognizing "that requiring the government's consent to an involuntary dismissal would raise separation-of-powers concerns). To read the law as Plaintiffs appear to do would give the government, in the context of FCA litigation brought by a relator, a power possessed by no other plaintiff in the civil justice system: to unilaterally prevent a court from dismissing its suit.

Thus, the Court has subject-matter jurisdiction over this case and power to rule on Defendants' Motion to Dismiss.

## II.  AKS and Illinois Health Care Worker Self-Referral Act counts

As Defendants correctly point out in the Memorandum to their Motion to Dismiss (doc. 33 at 7), neither the AKS nor the Illinois Health Care Worker Self-Referral Act allows for a *qui tam* right of action.[3]

---

[3] Plaintiff points out that the Health Care Worker Self-Referral Act is not purely administrative but also allows for civil penalties and may be enforced via the mechanisms of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505. However, the provision designating violations of the anti-self-referral law as unlawful under the Consumer Fraud and Deceptive Practices Act refers only to enforcement by the Attorney General or

Relator admits as much in his Response and refashions Counts 2 and 4 as theories or bases of liability under the FCA and IFCA rather than as independent claims. (Doc. 36 at 4). Those bases will be discussed in conjunction with the FCA and IFCA claims, but to eliminate any confusion, to the extent Relator's Complaint states any claims under the AKS or Illinois Health Care Worker Self-Referral Act alone, they are dismissed with prejudice.

## III.   False Claims Act

The False Claims Act, a federal statute, creates liability to the United States government for a party who

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; . . .

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . or

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government. 31 U.S.C. 3729(a)(1).

A private person, such as Relator here, may bring a civil action alleging a violation of the FCA by proceeding *qui tam*, "for the person and for the United States Government." 31 U.S.C. § 3730.

---

State's Attorney, 225 ILCS 47/55, and the Consumer Fraud and Deceptive Practices Act itself establishes a private right of action only for persons who "suffer[ ] actual damage." 815 ILCS 505/10a(a). Relator nowhere alleges he was personally injured by Defendants' acts or omissions.

*A.    Pleading standard*

An analysis of a False Claims Act claim on a motion to dismiss must begin with the applicable pleading standard, because such a claim alleges fraud. The elements of an FCA claim are falsity, materiality, causation, and *scienter* (knowledge). *United States ex rel. Prose v. Molina Healthcare of Ill.*, 17 F.4th 722, 740 (7th Cir. 2021). Of these, only the fourth, knowledge, is subject to the basic notice pleading standard of Federal Rule of Civil Procedure 8(a). The others must satisfy the heightened standard of particularity. Fed. R. Civ. P. 9(b).

As a preliminary matter, it is necessary to discuss the extent to which allegations pled "on information and belief" are adequate when pleading fraud. Circuits differ on this point, with Seventh Circuit courts frowning on the practice but recognizing an exception: "[I]nformation and belief won't do in a fraud case . . . unless (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *United States ex rel. Grenadyor v. Ukrainian Village Pharmacy*, 772 F. 3d 1102, 1107 (7th Cir. 2014) (internal quotations omitted).

Courts have construed this escape hatch narrowly. In *Pirelli*, the Court of Appeals rejected grounds for suspicion obtained secondhand from a lawsuit filed by someone other than the relator. 631 F.3d at 442. In *United States ex rel. Walner v. NorthShore University Health System*, the Central District found that "because [the relator] points only to himself as evidence of the fraud, he is in no position to claim that specific facts regarding his own patient care and Medicare payment are inaccessible to him." 660 F. Supp. 2d 891, n. 5 (N.D. Ill. 2009). Further calling into

question the broadness of the *Pirelli* and *Grenadyor* loophole, the Central District opined that the relator in one case "is stepping into the shoes of the government, and if he cannot plead with particularity alleged violations of the FCA, he stands in no better position to assist the government than any other citizen." *United States ex rel. Jarvis v. Alamo Group (IL), Inc.*, WL 6485792 at *5 (C.D. Ill. July 6, 2017). That a piece of evidence or information is "inaccessible" does not mean merely that it is not in the possession of the relator; it must be under the exclusive control of the defendant. *Id.* at *6.

Here, Relator relies "on information and belief" for many of his key allegations. These include that MWE assisted the other defendants in drafting TCOM's new operating agreement and "orchestrated and conspired . . . to devise a scheme to subvert the intent" of certain healthcare laws (doc. 1 at 2, 7); that "Advocate and its team . . . devised a scheme to violate" the same laws (doc. 1 at 5) and "knowingly and willfully hid the true identity of" BPMC (doc. 1 at 5); that BPMC's physicians referred patients to TCOM (doc. 1 at 26); and that "office employees" of BPMC and CCA often asked TCOM about the timing and amount of their revenue distributions (doc. 1 at 26). Relator repeats several of these allegations elsewhere in the Complaint without the same qualifier, but the Court must presume that if their basis originally was stated as "on information and belief," it remains such without additional clarification as to how Relator learned these facts. These are highly material statements striking to the heart of Relator's theory of liability, and so pleading these facts "on information and belief" alone is problematic.

12

Arguing that Relator's pleading of allegations on information and belief is insufficient in a fraud case, Defendants raise the relevant question of Relator's insider status: "Given Relator's access and inside knowledge, his allegations must be based on something more than 'information and belief.' " (Doc. 33 at 10). The Court agrees. Since Relator is a long-time member of the Defendant LLC in question, it stands to reason he would have direct knowledge of facts such as communications made to the law firm that represented TCOM as to the goals of the representation, which entities and physicians actually referred patients to TCOM, and on what basis TCOM's profits were distributed. If he does not have this information, he should at least be in a position to explain why not (for example, if he was deliberately excluded from and unaware of certain meetings involving the other members) and to differentiate between information he does not possess and information in the exclusive control of Defendants.

Moreover, in order to successfully plead fraud on information and belief, he must "provide[ ] the grounds for his suspicions," *Ex rel. Grenadyor*, 772 F. 3d at 1107, and not merely assert that Defendants knew or did this or that. This, in turn, requires him to explain how he has enough insider access to describe the precise mechanism of the fraud he alleges, yet does not possess enough evidence to justify going beyond information and belief in his pleading of crucial points.

In response to the Motion to Dismiss, Relator answers Defendants' concern with his use of the phrase "on information and belief" by assuring the Court that it "should not be interpreted as implying the substantive allegations in the complaint

. . . are insufficient to support the False Claims Act complaint." (Doc. 36 at 8). Rather, he says, he was erring on the side of caution where he might have "inadvertently use[d] an incorrect word or phrase." (Doc. 36 at 8). By hedging his bets in this manner, Relator ignores the accepted meaning of allegations stated "on information and belief": "based on secondhand information that the declarant believes to be true." *Information and Belief, On*, Black's Law Dictionary (11th ed. 2019). Relator presents himself as an original source of firsthand information on Defendants' conduct, knowledge, and plans, and so his choice of this method to set forth core allegations is perplexing. To the extent they are material to elements of his claims that must adhere to the Rule 9(b) heightened pleading standard, Relator's allegations pled on information and belief are inadequate.

### B. Falsity and Materiality

Relator brings claims under both 31 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(B), and so he is alleging both that Defendants filed false claims for payment and that it made a false statement that induced the government to pay those claims. Defendants can be divided into those who may be liable for filing false claims and those who may be liable for making false statements. Only TCOM submitted the claims at issue, and so only TCOM may be liable under § 3729(a)(1)(A). The other defendants (in addition to TCOM) could have made false statements material to the payment of claims, but they may not be liable for the claims themselves.

With respect to false statements, Relator relies on theories of express and implied false certification. Under an express false certification theory, a defendant makes a false statement when it makes an express statement, received by the

14

government, on which payment of a claim is based or files a claim using a form that explicitly states the conditions the defendant must meet in order to request payment from the government—and does so knowing it has not met those conditions. *United States ex rel. Absher v. Momence Meadows Nursing Ctr.*, 764 F.3d 699, 710 (7th Cir. 2014).

Under this theory, timing matters. "Promises of future compliance can be false or fraudulent only if made with intent not to perform." *United States ex rel. Ziebell v. Fox Valley Workforce Development Bd.*, 806 F.3d 946, 951 (7th Cir. 2015). "[F]raud requires more than breach of promise: fraud entails making a false representation." *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005). "Tripping up on a regulatory complexity does not entail a knowingly false representation." *Id.* In other words, if Relator's allegation is that Defendants agreed to certain conditions as conditions of participation in Medicare, then later violated those conditions and thereafter presented claims, this would constitute a broken promise, but not fraud, unless Relator also alleges Defendants never meant to comply with those conditions in the first place.

He does this in a general manner when he accuses all Defendants of working together to "orchestrate[ ] a plan to evade . . . federal and state laws" (doc. 1 at 23), but it is important to pin down which statement he means. He refers to a new version of TCOM's operating agreement, signed within the past 10 years, in which the LLC's named "institutional members" include group medical practices made up of physicians barred from referring patients to facilities such as TCOM under certain

15

circumstances. (Doc. 1 at 23). Yet, considering the plain language of the operating agreement as Relator describes it, it is difficult to construe that document itself as a false statement. The listed members, whether their actual makeup and structure, appear to be genuine institutional entities (Relator, for example, designates BPMC as a "for-profit corporation" (doc. 1 at 2)), and the Complaint does not allege that the agreement stated any institutional members were not comprised of individual physician practices or that those members or affiliated physicians would not refer patients to TCOM. Furthermore, the agreement was the organizing document of a business entity, not a representation made to any government payor.

Relator asserts that "[a]s a provider to patients covered by Medicare and Medicaid, Defendant TCOM was required to attest to and expressly certify it was in compliance with state and federal healthcare laws. Defendant TCOM, Defendant BPMC, Defendant Carle Foundation affirmatively attested to not violating state and federal laws and instead claimed compliance with the laws." (Doc. 1 at 33). Yet he does not allege when or how often these attestations took place or which claims they covered, nor does he connect any particular fraudulent claim to a point in time at which Defendants made a false statement concerning their compliance. The only identifiable express statement to which Relator refers is the Illinois Medicaid General Provider Agreement, which requires providers billing Illinois Medicaid for services provided to Medicaid beneficiaries to certify compliance with state and federal laws and regulations, including the Stark Law and Medicare Conditions of Participation.[4]

_____

[4] This would be a false statement material to Relator's IFCA claim, but in the interest of continuity, the Court will address it here.

16

(Doc. 1 at 15). However, Relator does not allege which, if any, defendant ever signed this agreement, when, and covering which claims.

Relator next relies on a theory, called implied false certification, that avoids some of the timing problems noted above. (Doc. 1 at 15). Implied false certification means that every time a payee submits a claim to the government, the claim itself constitutes a statement that the payee has not violated any conditions of payment. *Ex rel. Grenadyor*, 772 F.3d at 1106. In other words, in an implied certification case, the "false statement" element of the FCA is satisfied not by an affirmative attestation, but by an omission: the payee's failure to disclose to  the government its noncompliance. *Univ. Health Servs. v. United States*, 579 U.S. 176, 187 (2016). Relator states that every time Defendant TCOM submitted a claim, it was in essence stating that it had not violated laws such as the AKS, the Stark Law, and the Illinois Health Care Worker Self-Referral Act—a "statement" that was both false (untrue) and fraudulent, because it was designed to induce payment of a claim the government might not otherwise have paid. (Doc. 1 at 34).

In *Universal Health Services*, the Supreme Court resolved discordance among the circuits when it found that the implied false certification theory "can, at least in some circumstances, provide a basis for liability." 579 U.S. at 186. Yet it did not go so far as to conclude that "all claims for payment implicitly represent that the billing party is legally entitled to payment." *Id.* at 188. Instead, it set two conditions that must be present before this theory of fraud can be valid:

> (1) The claim "makes specific representations about the goods or services provided" and

(2) "[T]he defendant's failure to disclose noncompliance . . . makes those representations misleading half-truths." *Id.* at 190.

The Court doubled down on the significance of an objective and fact-driven analysis of materiality, finding that an omission may be material even if there is no express condition of payment addressing it, and conversely, that even a failure to disclose a violation of an express condition of payment must be material and does not "automatically trigger liability." *Id.* at 191. Courts must look to the facts of each case to determine whether a defendant's statement or omission was material to the government's decision to pay a claim. For example, in *United States v. Molina Healthcare of Ill.*, a case both Relator and Defendants cite, the appellate court cabined the applicability of the implied certification theory, finding "[i]t is not enough simply to say that the government required compliance with a certain condition for payment. The facts must indicate that the government actually attaches weight to that requirement and relies on compliance." 17 F.4th 722, 741 (7th Cir. 2021). There, Relator was able to clear this bar and proceed to discovery, even without "voluminous documentation" (and even though the State of Illinois continued paying Molina after learning it was not able to provide contracted services), because his allegations led to a strong logical inference of fraud—one that did not easily allow alternative explanations for the conduct he described. *Id.* at 741.

In support of the materiality of anti-kickback and anti-self-referral provisions, Relator here points to language in Medicare conditions and the Medicaid provider's agreement. (Doc. 1 at 15). He discusses the AKS, Stark Law, Illinois Health Care Worker Self-Referral Act, and OIG advisory opinions on prohibited referrals,

emphasizing the seriousness with which the payors in this scenario treat the kind of self-dealing he purports to allege. (Doc. 1 at 8–21). He does not allege facts related to whether those programs in fact decline payment where arrangements or schemes of the type he describes are present in a Medicare-certified provider.

Yet the primary flaw in Relator's Complaint is far more basic. Regardless of whether violations of the laws and regulations he mentions—or false implied certifications that they were followed—would be material to payment, he fails to adequately allege that Defendants' conduct violated them at all.

The Court takes as true at this stage Relator's statement that CCA and BPMC are entities made up of individual physicians' practices. However, this is not tantamount to alleging that those individual physicians profited in an unlawful way (or in any way at all) from the operations of TCOM. He does not characterize the business structure, ownership, or revenue-sharing arrangements of CCA or BPMC; describe the basis on which any distributions to BPMC, CCA, or its physicians were calculated; or allege that distributions to the group practices were proportional to the number of patients they referred to TCOM or RCC.[5] Explaining that one type of

---

[5] In fact, at one point in the Complaint he states, "Each of the defendants received financial distributions in direct proportion to their percentage ownership interest in the TCOM surgery center." (Doc. 1 at 32). This would seem to be at odds with his theory that BPMC and CCA were rewarded for their own referrals (not merely sharing profits derived from the sum total of all referrals and patients, from all sources). With respect to the relationship between TCOM and its affiliated RCC, Relator does state, "Reimbursement [of TCOM by the RCC] is directly and proportionately based on the volume of referrals." (Doc. 1 at 30). However, those referrals supposedly originated from TCOM, not BPMC or CCA (the entities allegedly prohibited from referring patients to facilities where their physicians would not be providing care), and relate to alleged kickbacks received by TCOM, not the physicians in the BPMC or CCA practices. Relatedly, there is no allegation—even in response to Defendants' raising of the issue—that RCC's payments to TCOM were above market rate or otherwise improper.

business is an instrumentality of another is not the same as alleging that the underlying individuals were enriched by or responsible for the actions of the parent entity, without saying more about who controls, owns, and benefits from it.

Although Relator expends 14 pages of his Complaint summarizing them, he ultimately oversimplifies the laws he claims Defendants violated by virtue of their business arrangements. The Stark Law allows certain financial relationships exempt from the general rule against self-referral, the Illinois Health Care Worker Self-Referral Act creates a process by which self-referrals may occur in high-need communities, and the requirements of the AKS are so complex as to warrant a flotilla of advisory opinions from the applicable Office of the Inspector General, educating healthcare organizations on which structures may be higher or lower risk under the law. (Doc. 1 at 18–21). Relator compares Defendants' scheme to higher risk arrangements described in some of these advisory opinions and asserts it falls into no safe harbor (a statement Defendants correctly note does not automatically mean it is unlawful (doc. 33 at 15–16)), but he does not offer allegations, for example, that distributions from TCOM to the group practices depend on referral volumes rather than the share each member has invested in the LLC, or that BPMC and CCA had not obtained an exemption from the Illinois Health Care Worker Self-Referral Act.

Relator's failure to proffer representative examples of claims, bills, or transactions accentuates the cracks in the Complaint's logic. This circuit has often

required representative samples in *qui tam* FCA cases, with few exceptions.[6] *See, e.g.,*
*Ex rel. Grenadyor*, 772 F. 3d 1102 at 1107 (Relator must name at least one patient
who allegedly received a kickback or on behalf of whom a fraudulent Medicare claim
was filed); *United States ex rel. Sibley v. Univ. of Chicago Med. Center*, 44 F. 4th 646
(7th Cir. 2022) (finding "specific examples [are] necessary to defeat dismissal" and
the relator's "inferential leaps ask too much"); *compare with United States ex rel.*
*Mamalakis v. Anesthetix Management*, 20 F.4th 295, 301 (7th Cir. 2021) (finding even
in the absence of bills or claims, relator's specific narrative examples of falsely billed
procedures, including dates, provider names, and procedure types, were particular
enough); *Prose*, 17 F.4th at 741 (no "voluminous documentation" of claims necessary
when relator described the scheme in detail and his allegations strongly supported
the inference that the only logical explanation for defendant's conduct was fraud).

Here, the lack of representative claims[7] means there are no facts connecting
the allegedly unlawful referrals to the submission of claims to the government.
Relator provides data on the number and total dollar amount of Medicare and
Medicaid claims paid to TCOM in 2015 through 2017, and he avers that BPMC and
CCA made thousands of unlawful referrals over the past 10 years, but he does not

---

[6] Nationwide, the circuits are divided on this question. The Fourth, Sixth, Eighth, and
Eleventh Circuits require "representative samples" of fraudulent bills or claims, while the
First, Third, Fifth, and Ninth Circuits have set forth a more lenient standard. *U.S. ex rel.*
*Repko v. Guthrie Clinic*, 557 F. Supp. 2d 522, 526 (M.D. Penn. 2008).
[7] Relator responds to Defendants' argument about the lack of representative claims (doc. 33
at 8) by pointing out that the Complaint contains a reference to the number of beneficiaries
for which claims associated with a specific code were submitted to Medicare. (Doc. 36 at 11).
Not only is this not what is meant by a representative example; it is irrelevant to Relator's
claims, since he does not state that any of the claims billed under that code were for patients
referred by BPMC or CCA in an unlawful manner.

take the essential step of alleging that any Medicare or Medicaid beneficiary was referred to TCOM by a BPMC or CCA physician in violation of law, and that TCOM then billed and was paid by either payor for services TCOM provided.

Thus, Relator fails to plead with adequacy the element of material falsity—either with respect to the claims themselves, or any express or implied statements Defendants made to induce payment.

C.    *Causation*

The FCA creates a cause of action against anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729. In other words, the only parties who can cause an injury to the government under the FCA are those who present claims for payment or make statements that are material to claims.

Among Defendants in this case, only TCOM has presented allegedly false claims to the government.[8] MWE, a law firm, does not bill Medicare or Medicaid for healthcare services, and the medical billing practices of Advocate, BPMC, and Carle themselves are not at issue here. Likewise, inasmuch as the false statement Relator identifies is the implied certification that a payee billing a government assistance program is in compliance with its Conditions of Participation and other applicable laws and regulations, only TCOM made such statements. The other defendants could only have caused such a representation to be made if, in concert, they controlled the

---

[8] Relator appears to allege that the affiliated RCC also submitted false claims, but it is not named as a defendant in this suit.

billing department of TCOM (presumably exclusive of its non-defendant members) or if TCOM was such a lifeless instrumentality of its Defendant members as to justify piercing the corporate veil and holding them individually liable for its actions. Relator does not make either argument.

He does allege that all Defendants, including MWE, were "collectively responsible" for drafting and agreeing to TCOM's operating agreement, which he proffers as a false statement in that it concealed the true nature of BPMC and CCA by listing them as institutional members rather than physician members. (Doc. 1 at 6). But, as already discussed, this does not suffice as a false statement rendering later claims for payment fraudulent. Defendants, in support of their Motion to Dismiss, state that Relator impermissibly lump all defendants together without explaining how each is individually liable. (Doc. 37 at 2). The Court agrees. Relator strains credulity, for example, when he concludes that "[a]ll of the Defendants benefited financially by allowing an illegal ownership/investment interest by a primary care group that was referring patients, directly or indirectly, to the TCOM surgery center and [RCC] in violation of the law." (Doc. 1 at 32). He does not specifically allege any way in which Advocate benefited from BPMC or CCA referrals, nor is it reasonable to infer from these facts that MWE (even if it knew of the other defendants' unlawful purpose and assisted them in carrying it out) earned a higher fee as a result of the scheme than it would have commanded to draft any other operating agreement.

Causation under the FCA is lacking as to Advocate, Carle, BPMC, and MWE.

*D.    Knowledge*

Relator is not required to plead knowledge with particularity; he need only plausibly allege that Defendants acted knowingly within the meaning of the applicable statutes. Fed. R. Civ. P. 9(b). Under the FCA, "knowing" means "that a person, with respect to information. . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). However, there is no requirement of "proof of specific intent to defraud." *Id.*

Relator alleges all Defendants knowingly intended to create a business structure that would facilitate illegal referrals and thus false claims. (Doc. 1 at 6). Such statements closely approach *Iqbal*'s definition of a statement that is a conclusion of law rather than an allegation of fact, 556 U.S. at 678, in that they merely recite an element of the cause of action (knowledge) and offer virtually no further information about who knew what and when (and how Relator knows that). The only trace of a narrative about knowledge is that at some point, Defendants met with MWE attorneys to revise the operating agreement in order to set their scheme into motion. (Doc. 1 at 7). Even this allegation is vague as to knowledge. Relator states that "[a]t some point in the distant past, Defendant TCOM . . . amended its operating agreement to define and separate 'institutional class members.' . . . Within the past 10 years, the 'Institutional Class Members' were defined to mean" BPMC, Advocate, CCA, and Carle. (Doc. 1 at 23). He does not clarify whether the plan to conceal illegal referrals began with the inclusion of institutional class members in the operating agreement, or only once the list was revised, nor who was involved in both decisions.

24

It is especially implausible, without additional allegations, that MWE—simply by virtue of the fact that its attorney or attorneys drew up TCOM's organizing papers—knew the purpose of that particular business organization was to violate anti-referral laws. Relator does not allege that the other defendants told MWE or the Doe attorney(s) of their scheme, nor that MWE stood to profit from the allegedly false claims and ill-gotten revenues (beyond its payment for legal services rendered).

Relator's FCA claim abounds with detail but simply does not plead certain essential connections. It leaves the Court to draw inferences that do not of logical necessity follow from the allegations presented. Nor does Relator make a sufficient case excusing his omission of representative examples of claims or patient referrals. Finally, he fails to explain how each defendant participated in the scheme and is liable. The FCA claim against each defendant is dismissed.

## IV.    Illinois False Claims Act

Relator alleges Defendants' conduct also violated the IFCA because TCOM submitted claims to Medicaid that were paid by the State of Illinois. (Doc. 1 at 35). Since the IFCA "closely mirrors the FCA" in terms of its substantive elements and pleading standard, and as the discussion of Relator's FCA claim addressed implied false certification in the Medicaid context and the allegation that Defendants violated the Illinois Health Care Worker Self-Referral Act, the Court will not repeat that analysis here but grant Defendants' motion to dismiss the IFCA claim for the same reasons. *Bellevue v. Univ. Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 n. 2 (7th Cir. 2017) ("[T]o date we have not found any difference between the statutes that is

material to a jurisdictional or merits analysis. *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 704 n. 5 (7th Cir. 2014).").

## V. Payment by mistake and unjust enrichment

Finally, although he does not list them as counts, Relator seeks to bring suit under two common-law causes of action: payment by mistake and unjust enrichment. He names these as alternative theories of recovery by both the United States government and the State of Illinois. (Doc. 1 at 3).

Under federal common law, which governs payments to a federal government program such as Medicare, "[t]he equitable theory of unjust enrichment allows restitution 'where the person sought to be charged is in possession of money or property which in good conscience he should not retain, but should deliver to another.'" *U.S. v. Rogan*, 459 F. Supp. 2d 692, 721 (N.D. Ill. 2006) (quoting *Matarese v. Moore-McCormack Lines*, 158 F.2d 631, 634 (2d Cir. 1946)). "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *U.S. v. Wurts*, 303 U.S. 414 (1938).

The elements of payment by mistake under federal common law are that "(1) payments were made (2) under the belief that they were properly owed; (3) that belief being erroneously formed; and (4) the mistaken belief was material to the decision to pay." *United States v. Adams*, 371 F. Supp. 3d 1195, 1217 (N.D. Ga. 2019) (quoting *U.S. v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 776 (N.D. Tex. 2003)); *see also U.S. ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1316 (W.D. Okla. 1998).

Courts have found both payment by mistake and unjust enrichment are alternative theories of recovery, alongside an FCA claim, for *qui tam* relators. *See,*

26

*e.g.*, *United States ex rel. Dildine v. Pandya*, 389 F. Supp. 3d 1214, 1222 (N.D. Ga. 2019); *United States v. Rite Aid Corp.*, No. 2:12-cv-01699, 2018 WL 4214887, at *8 (E.D. Cal. Sept. 5, 2018); *but see Ex rel. Trim*, 31 F. Supp. 2d at 1316 ("[I]t appears the theories are mutually exclusive and that either one is mooted by the Court's findings under the FCA; however, as neither side has briefed these issues, the Court will defer any ruling on the alternative theories of recovery.").

Illinois recognizes similar common-law causes of action. "Generally, where money is paid under a mistake of fact, which would not have been paid had the facts been known to the payor, such money may be recovered." *Board of Ed. Of City of Chicago v. Holt*, 41 Ill. App. 3d. 625, 626 (1976). "[A]n action is maintainable in all cases where one person has received money, which belongs to another, under such circumstances that in equity and good conscience he ought not to retain it." *Id.*

It is evident that either claim may be brought only against TCOM. Only TCOM billed Medicare and Medicaid for the services in dispute, and thus TCOM is the only defendant that could be liable to repay the government for payments wrongfully or mistakenly disbursed. As neither cause of action requires an allegation of fraud, Relator need not plead these with particularity (names, dates, places, and so forth). Neither involves an element of knowledge or ill intent on the part of the payee. Yet both still depend on the basic assumption that claims TCOM submitted to Medicare and Medicaid should not have been paid (and, in the case of payment by mistake, would not have been paid, had the payors known the full story). His claims founder once again on his failure to connect the steps in the scheme by alleging that individual

27

physicians practicing under the auspices of BPMC and CCA referred patients to TCOM and received payments or distributions unlawfully linked to those referrals. Without establishing this, Relator cannot plausibly reach the conclusion that TCOM (or any other defendant) was unjustly enriched or that the government paid it by mistake. An amended complaint may offer enough support for these claims to lie, but at this juncture, they are dismissed.

## CONCLUSION

Defendants' Motion to Dismiss is GRANTED. Relator's claims under the Anti-Kickback Statute and the Illinois Health Care Worker Self-Referral Act are DISMISSED WITH PREJUDICE. All claims against Advocate Health and Hospitals Corporation, BroMenn Physician Management Corporation, The Carle Foundation, and McDermott Will & Emery are likewise DISMISSED WITH PREJUDICE. Plaintiff's remaining claims against The Center for Orthopedic Medicine are DISMISSED WITHOUT PREJUDICE, with leave to refile.


SO ORDERED.

Entered this 5th day of April 2023.

_____s/ Joe B. McDade_____
JOE BILLY McDADE
United States Senior District Judge
